UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                          Chapter 7
Nikki Lee                                                      Case No. 08-24243-svk
      Debtor.

Leland G. Christenson II,
      Plaintiff,
v.                                                             Adv. Proc. No. 08-2203

Nikki Lee,
      Defendant.

**MEMORANDUM DECISION**

      Leland Christenson was a gun enthusiast who wanted to add machine guns to his collection. Nikki Lee was an experienced gun dealer who specialized in rare machine guns. The two met at a "shoot," and forged a relationship in which Lee agreed to procure machine guns and accessories for Christenson. Although their first transaction went smoothly, the next one went South. Eventually, Lee filed bankruptcy, and Christenson filed this adversary proceeding claiming that Lee committed fraud. Christenson also contends that Lee was less than forthcoming on his bankruptcy schedules, and concludes that Lee's entire discharge should be denied. A full day trial was held, and the parties filed post-trial briefs. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law. For the reasons that follow, the Court will except Lee's debt to Christenson from the discharge, but will not deny Lee's general discharge.

      We begin with some basic, but essential, terminology. For our purposes, machine guns may be grouped into two different classes: "transferable" and "nontransferable." Although

expensive, transferable machine guns can be purchased with relatively few requirements, such as a background check, a letter from a local law enforcement official and payment of a fee. Nontransferable machine guns, as the name suggests, cannot be bought and sold by the public; these weapons require a Class 3 gun dealer's license to purchase, sell or even possess. Nontransferables are subject to strict Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) requirements, including the right of ATF to inspect the Class 3 gun dealer's premises annually. Trial Tr. 106. Essentially, nontransferable machine guns are intended for sale to law enforcement and the military only.

Whether a machine gun is classified as transferable or nontransferable depends on its manufacture date. Transferable weapons are those manufactured before May 1986; they are considered collectible and more valuable than nontransferables. Because the manufacturing date determines whether a machine gun is transferable, the same model gun may be transferable or nontransferable. For example, a pre-1986 (transferable) M-16 may sell for between $11,000 to $18,000, while a new (nontransferable) M-16 can be purchased by law enforcement or the military for $600 to $1,000. *See Machine Guns: Machine Gun Price Guide July 2009*, *available at* http://machinegunpriceguide.com/html/us_mg_4.html (last visited Aug. 25, 2009). The transaction at issue here involves two nontransferable machine guns: a Negev SAW and a P-90.

## STATEMENT OF FACTS

Christenson and Lee met at the machine gun shoot and discussed Christenson's potential purchase of an MP5. Trial Tr. at 161. Later, Lee called Christenson and said he had located one that Christenson could purchase. Trial Tr. at 162. On April 9, 2002, Christenson wired $11,000 to Lee to purchase the MP5. Trial Tr. 162-63. It is not disputed that the MP5 Lee purchased for Christenson is a transferable machine gun. Later in April 2002, Christenson sent another $4,700

to Lee for an M11 and two Gemtec suppressors; these are also considered transferables. Trial Tr. 164. Lee disputes that this payment was for these items; he testified that the additional $4,700 was part of the payment for the MP3. Trial Tr. 219. Lee delivered the MP5 to Christenson in December 2002 (Trial Tr. 5); Christenson was very pleased with the transaction, and decided to purchase more machine guns for his collection. In December, Christenson transferred $25,500 to Lee to purchase a Negev. Trial Tr. 165-66. Christenson was adamant that Lee did not tell him at that time that he needed a Class 3 license to purchase the Negev: "Never. He never represented it as a – as a – military or a – police weapon of any sort." *Id.* Christenson's interest in the machine guns was solely as a collector or investor; he had absolutely no desire or intent to become a Class 3 dealer. Trial Tr. 156, 158-159. Christenson testified he made that fact clear to Lee from the beginning (Trial Tr. 181, 182), and therefore assumed Lee understood that Christenson was only interested in transferable weapons. While waiting for the Negev, in April 2003, Christenson sent Lee another $9,000 to purchase a P90:

> He said that I should probably try to get a P90. A P90 is another really neat weapon that I could add to the collection. And it would be one that would be very valuable to have. So, I said okay, why don't we get one?

Trial Tr. 169.

By December 2003, when Christenson had not received the Gemtechs, the Negev or the P90, he was becoming increasingly concerned. *Id.* He contacted Lee who advised him the Negev had arrived, and invited him to come to Lee's house to see it. Trial Tr. 170. When he got there, Lee showed him the Negev, and advised that Christenson would need his Class 3 license to take possession of it. *Id.* Christenson was taken aback:

> And I'm going wait a minute. . . . That's not the deal. Our deal all along everywhere has been I've done what you told me to do. . . You've given me what I've (sic) want – transferable guns. . . .[Y]ou know, the whole deal is transferables

and now all of a sudden you're trying to tell me that . . . I'm getting a . . . Class 3 license. That's not what I'm interested in. I'm not going to do that.

Trial Tr. 171. Christenson demanded either transferable guns or his money back. Trial Tr. 172. Lee delivered neither, eventually admitting he had spent the money. Trial Tr. 173.

Lee's testimony contradicts Christenson's in many key respects. He claims Christenson wanted to buy nontransferable weapons on the day they met. Trial Tr. 215. He says that he sent Christenson pictures and literature concerning the Negev and P90, clearly showing them to be nontransferable machine guns, and Christenson ordered them anyway. Trial Tr. 216-17. Lee testified that rather than Christenson seeing the Negev for the first time at Lee's house, Lee brought the Negev to Christenson's business. Trial Tr. 222. According to Lee, Christenson wanted to take immediate possession of the Negev, but Lee explained that he would need the Class 3 license. Trial Tr. 223. When Christenson never got around to obtaining the license, Lee just figured he was a "busy guy." Trial Tr. 248.

Christenson claims that Lee duped him by taking money for transferable machine guns that he did not deliver. Lee counters that Christenson was aware that these guns were nontransferable and either changed his mind about the purchase or failed to timely do what was necessary to take possession of the weapons. Lee also purports to have incurred storage costs that offset Christenson's claim.

### ANALYSIS

<u>1. Did Christenson prove by a preponderance of the evidence that Lee's debt to Christenson was incurred by fraud, misrepresentation or false pretenses?</u>

Bankruptcy Code § 523(a)(2)(A) declares debts nondischargeable to the extent based on fraud, false pretenses, or false representations other than a false financial statement. 11 U.S.C. §

523(a)(2)(A). Fraud can be found in an express misrepresentation or failure to disclose a material fact:

> Actual fraud precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception. However, fraud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact.

*In re Faulk*, 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986) (internal quotes and citations omitted). In addition to proof of either an express or implied misrepresentation, a creditor in a § 523(a)(2) nondischargeability action must prove four additional elements: (1) the debtor knew the representation was false; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied; and (4) the creditor was damaged as a proximate result of relying on the misrepresentation. Susan V. Kelley, GINSBERG & MARTIN ON BANKRUPTCY, § 11.06[D] (5th ed. Supp. 2009).

A breach of a contract or a failure to perform some promised act, by itself, will not render a debt nondischargeable under § 523(a)(2)(A), although entering into a contract or making a promise with no intention of performance may support a finding of nondischargeability. *See McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir. 2000) (expanded reading of "actual fraud"). Does this case involve a mere breach of a contract by Lee to purchase transferable weapons on Christenson's behalf or something more nefarious?

Neither party can point to an express representation made by Lee that the Negev and P-90 were transferable; but the circumstances clearly show that Lee implied they were. Christenson testified that at the beginning of the parties' relationship, he "made the understanding clear… I only wanted transferables." Trial Tr. 201. In his deposition, Lee admitted that he assumed

Christenson was interested in collecting the weapons "and that he was an avid shooter like we were."  Trial Tr. 90.

Although Lee testified that Christenson knew that Lee specialized in nontransferables (Def.'s Resp. to Pl.'s Post-Trial Brief at 3), and denies that Christenson said he only wanted to buy transferable weapons (Trial Tr. 286), Lee's behavior at the time of the transaction and the circumstances surrounding the sale undermine his testimony.  First, all of the previous transactions between the parties involved only transferable machine guns and accessories.  Second, the Negev and P-90 were rare and expensive (traits commonly associated with transferables).  Third, Christenson had expeditiously returned the paperwork for previous transactions involving transferable guns, yet by the time he advanced the money for the Negev and P-90, it had been a year since Lee had given him Class 3 license paperwork, which Christenson never completed or returned -- a strong indicator that he had no interest in purchasing nontransferable weapons.  Fourth, Christenson had another ready source for nontransferable weapons at the "Shot Show," a sporting goods show he attended regularly, and if he had wanted to obtain nontransferable weapons, he could have applied for the Class 3 license and obtained the guns from the manufacturers there, avoiding the middleman.  Trial Tr. 159.  Fifth, Lee's testimony concerning the Negev transaction was not believable.  Despite a lengthy inquiry to corroborate the details of the meeting when Lee allegedly brought the Negev to Christenson's business, Lee was unable to plausibly explain the timing and purpose of the meeting.  Trial Tr. 233-40.  Finally, Christenson testified that he did not want the burdens and responsibilities of a Class 3 gun dealer; he owns and runs several manufacturing businesses.  Trial Tr. 152, 159.  Lee suggested that Christenson was simply interested in owning the "high tech" nontransferable weapons like the Negev and P90 without becoming an active dealer.

However, according to gun dealer Steven Lauer, who testified as an expert on machine gun values, trading nontransferable weapons between Class 3 dealers offers no investment potential. "[W]hat most of those guys are doing with those guns is just shooting them. They have a license so they can shoot them. They have no value." Trial Tr. 358. When asked whether he had experience dealing in that market, Lauer responded: "Certainly not. It's – it's not quite kosher." *Id.* Dean Shall, another witness, was even more direct when asked whether a collector who is not a dealer could obtain a Class 3 license: "That wouldn't be legal. If I understand the question correctly. You cannot possess a – you cannot have a Federal firearms license to further a collection." Trial Tr. 106. Shall's and Lauer's testimony supports Christenson's version of events. Christenson did not wish to start a business dealing guns to police departments or the military or embark on the illegal or "not quite kosher" alternative; he simply wanted to add machine guns to his gun collection as an investment vehicle. Trial Tr. 154, 156.

Although this is a close case, the credibility scale favors Christenson, and the Court finds that Christenson's testimony that he made it clear to Lee that he only wanted transferables is supported by the parties' behavior. With that understanding, Lee was obligated to disclose to Christenson the very material fact that the Negev and P-90 were nontransferable guns, at or before the time Christenson parted with his money. Lee's failure to divulge that information is a failure to disclose a material fact, constituting fraud by "silence, concealment or intentional non-disclosure of a material fact" as described by the *Faulk* court. 69 B.R. at 750.

In a somewhat similar factual scenario, in *Bombardier Capital, Inc. v. Baietti (In re Baietti),* 189 B.R. 549 (Bankr. D. Me. 1995), the debtor, a boat dealer, failed to disclose to his lender that a number of boats located on his property, which appeared to be unsold inventory, had actually been sold. Since the debtor was required to remit the proceeds of boat sales to the

lender, the lender routinely inspected the debtor's boatyard. *Id*. at 552. The debtor defended by arguing that he did not affirmatively misrepresent the fact that several boats on his property had been sold; rather, he was merely a "silent onlooker" while the lender derived false information from inspecting the boatyard. *Id*. The court held that the false impression created by the debtor's failure to disclose the sale of the boats constituted false pretenses under § 523(a)(2)(A). *Id*. Similarly, while Lee may not have affirmatively represented that the Negev and P-90 were transferable, it is more likely than not that his silence on the matter led Christenson to believe that they were transferable based on past experience. Having found the requisite false representation, the Court turns to the four remaining elements of the analysis.

Although Lee has argued that he lacked the requisite intent to deceive Christenson (Def.'s Resp. to Pl.'s Post-Trial Brief at 3), the Seventh Circuit has held that wrongful intent may "logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan." *In re Kimzey*, 761 F.2d 421, 424 (7th Cir. 1985). By not disclosing that the weapons were nontransferable, Lee effectively induced Christenson into the transaction, and the Court can infer Lee's wrongful intent from this omission. *Id*.

The parties also dispute whether Christenson justifiably relied on Lee's implied representation. *See Field v. Mans*, 516 U.S. 59 (1995) (establishing justifiable reliance test). At trial, Lee argued that Christenson researched the guns on the internet, negating any reliance on Lee's alleged misrepresentations. Trial Tr. 192. However, there is no evidence that Christenson knew the year the Negev and P-90 were manufactured, which is critical to their status as nontransferable weapons. Lee testified that he sent Christenson information concerning the Negev and the P90 that clearly showed these weapons were nontransferable. Trial Tr. 220. However, there was nothing to corroborate this very critical assertion. On the other hand,

Christenson testified at length about how many businesses he owns, his stress level, and the variety of reasons that he did not want to become a Class 3 gun dealer. From all of the testimony presented, it is apparent that if Christenson knew the machine guns were nontransferable, he would not have purchased them. The circumstances surrounding the transaction support Christenson's allegations that he justifiably relied on Lee's implied misrepresentations.

In short, Christenson has proven by a preponderance of the evidence that Lee intentionally made a material misrepresentation (by failing to disclose that the guns were nontransferable), on which Christenson justifiably relied. There is no dispute that Christenson advanced $44,500 to Lee for these machine guns, thus establishing that Christenson was damaged by Lee's misrepresentation. The Court rejects Lee's argument that Christenson's damages should be reduced by Lee's storage costs for the weapons.

<u>2. Did Christenson prove by a preponderance of the evidence that Lee either (A) knowingly and fraudulently made a false oath in the Schedules; or (B) failed to keep or preserve any recorded information from which his financial condition could be ascertained?</u>

**A. False Oaths**

Bankruptcy Code § 727(a)(4)(A) provides that the court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently made a false oath in connection with the case. Before the debtor can be denied a discharge for making a false oath, five requirements must be met: (1) the statement is under oath; (2) the statement is false; (3) the statement is materially related to the case; (4) the debtor knew the statement was false; and (5) the debtor made the statement with fraudulent intent. *Lee Supply Corp. v. Agnew*, 818 F.2d 1284, 1289-90 (7th Cir. 1987). In applying these requirements, courts must consider that a Chapter 7 discharge

recognizes the Congressional intent of providing the debtor with a fresh start.  Recognizing this, the Supreme Court has declared that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life and a clear field for future effort, unhampered by pressure and discouragement of preexisting debt.'"  *Grogan v. Garner,* 498 U.S. 279, 287 (1991) (citing *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934)).  As such, § 727(a) must be construed strictly against the objecting party and liberally in favor of the debtor.  *In re Martin,* 157 B.R. 268, 272 (Bankr.W.D.Va.1993) (citing *Gleason v. Thaw,* 236 U.S. 558, 560 (1915)).

Christenson claims that Lee made false oaths by representing to the Trustee that the bankruptcy documents were true and complete when in fact there were serious omissions in the Schedules.  Christenson alleges Lee failed to disclose several material matters, including: (a) the existence of fraudulent transfers to Henry Rahr, (b) Lee holding the "title" to the weapons transferred to Rahr, and (c) the existence of the World Burnout Tour motorcycle stunt riding business.  *See* Trial Tr. 11.

It appears that the first and second requirements are met—Lee made false statements under oath in his Schedules and again while giving testimony at the meeting of creditors conducted by the trustee.  When a debtor is in doubt concerning whether certain assets must be disclosed, he or she is obligated to disclose them.  *In re Calisoff*, 92 B.R. 346 (Bankr. N.D. Ill. 1988).  In his bankruptcy Schedules, Lee failed to mention any involvement with the World Burnout Tour, an endeavor that paid his expenses and was his sole source of livelihood.  Instead, Lee told the trustee that he was "unemployed," and he was "looking for work out of state."  Trial Tr. 9.  These vague statements as to how he was earning his living may not constitute blatant falsities, but they clearly do not amount to full disclosure, which is required in the Seventh

Circuit. *See United States v. Ellis*, 50 F.3d 419 (7th Cir. 1995) (§ 727 makes full disclosure a condition precedent to discharge).

The materiality requirement is met because Lee's omissions bore a relationship to his business transactions or estate or could lead to the discovery of assets or the existence or disposition of property. *See Mick v. Bricker (In re Mick)*, 310 B.R. 255, 262 (D. Vt. 2004) (debtor's statements regarding amounts he earned from a business entity and omission regarding his role as managing executive of that entity were material).

The final requirements—that an omission or misstatement must have been knowingly and fraudulently made—are closer calls. Lee's omissions apparently resulted from carelessness or a mistaken belief that the information was not important; he testified that he has a high school education and little business acumen. A false oath made inadvertently, under a mistaken belief, or even carelessly is not grounds for denial of discharge. *Painewebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 438 (S.D.N.Y. 1996). Christenson points to the number of alleged inaccuracies and omissions by Lee. He is correct that the cumulative effect of a number of false oaths on the Schedules and Statement of Financial Affairs can establish the requisite fraudulent intent. *Neary v. Stamat (In re Stamat)*, 395 B.R. 59, 72 (Bankr. N.D. Ill. 2008) (citing *In re Costello*, 299 B.R. 882, 900 (Bankr. N.D. Ill. 2003)). However, a comparison of Lee's conduct in this case with the debtors' omissions in *Stamat* is illuminating. Lee failed to disclose the transfer of a $5,000 nontransferable gun to another gun dealer (allegedly in payment of a loan) and his involvement in a motorcycle stunt show that only paid his expenses. Trial Tr. 64.

In *Stamat*, the debtors failed to disclose numerous assets and sources of income in their Schedules and Statement of Financial Affairs, including the husband's part time employment as a police officer, two guns, business interests, and counterclaims they were pursuing. 395 B.R. at

72. They also failed to identify payments and transfers of their property interests made within two years before filing the bankruptcy petition, such as two refinancings of their second home (for which they received more than $90,000) and settling pending litigation with a $10,000 cashier's check. *Id*. Additionally, the debtors in *Stamat* had a much higher degree of education and business sophistication than Lee.

Although a description of Lee's relationship with the World Burnout Tour and the circumstances behind the transfer of the gun to Rahr could have been better explained in the Schedules, the Court does not find that Lee's failure to disclose these items was accompanied by fraudulent intent. In short, Christenson has failed to meet his burden of proof that Lee knowingly and fraudulently made false oaths in this case.

### B. Failing to Keep or Produce Adequate Records

Bankruptcy Code § 727(a)(3) provides that the court shall grant the debtor a discharge unless:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

Under this provision, a debtor has an obligation to keep and produce books and records sufficient to permit the court, creditors and trustee to construct an accurate picture of the debtor's financial history. The adequacy of a debtor's books and records is, in some respects, judged by the sophistication of the debtor's business and financial affairs. *See In re Scott*, 172 F.3d 959 (7th Cir. 1999) ("where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping").

In determining whether an individual debtor's records are adequate, the court should assess how a reasonable person would have acted under similar circumstances. *In re Greene*, 202 B.R. 68, 71 (Bankr. D. Md. 1996) This assessment includes a variety of factors, such as: whether the debtor is engaged in business; the complexity and volume of the business; the amount of debt; whether the failure to keep or produce records was the debtor's fault; the debtor's education, business experience and sophistication; customary business practices for recordkeeping in the debtor's business industry; the degree of accuracy disclosed by the existing books and records; the extent of any egregious conduct by the debtor; and the debtor's courtroom demeanor. *See In re Volpert*, 175 B.R. 247, 265 (Bankr. N.D. Ill. 1994) (sufficiency of a debtor's records are to be determined on a case-by-case basis, considering the size and complexity of the debtor's business, the debtor's sophistication, experience, and business acumen).

Christenson claims that Lee's discharge should be denied on this ground because Lee failed to produce bank records and credit card statements for the two years before his bankruptcy. During this time, Lee was operating a coffee shop business and was buying and selling guns, which he testified was more of a "hobby" than a business. He produced two tax returns for the coffee shop business and the gun sale logbook required of the ATF. Given Lee's limited education, small-scale operations, and relatively lax practices in the industries in which Lee did business, his failure to produce more voluminous records does not rise to the level required to deny his discharge under § 727(a)(4).

## CONCLUSION

Christenson has met his burden of proving by a preponderance of the evidence that Lee's debt to Christenson arose from fraud, false pretenses or misrepresentation as defined by Bankruptcy Code § 523(a)(2)(A). Lee's debt to Christenson for the advance of the funds to

purchase the Negev and P-90 is thus nondischargeable. Christenson did not satisfy the burden of proving that Lee's discharge should be denied for false oaths or failure to keep books and records. A separate judgment will issue.

Date: September 2, 2009

By the Court:

Susan V. Kelley
U.S. Bankruptcy Judge